**FILED**
**APRIL 21, 2022**
**In the Office of the Clerk of Court**
**WA State Court of Appeals, Division III**

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 38555-8-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | OPINION PUBLISHED IN PART |
| | ) | |
| ANDRE DEVOUN MCKENZIE, | ) | |
| | ) | |
| Appellant. | ) | |

PENNELL, J. — Racist rhetoric has no place in our justice system. It is hurtful,

thwarts due process, and undermines the rule of law. When the State invokes racist

rhetoric at a criminal trial, we will generally grant the defense relief regardless of a

contemporaneous objection. The only exception is the rare circumstance where the

State can prove its conduct was harmless beyond a reasonable doubt.

Andre McKenzie is a Black man who was accused of targeting a white girl for sexual exploitation. At trial, the State introduced the concept of a "gorilla pimp." No witness had used this terminology and the issue of pimping had minimal relevance. The only purpose served by referencing the gorilla pimp concept was to tap into deep-seated racial prejudice by comparing Black human beings to primates. The State cannot prove that this racist rhetoric was harmless beyond a reasonable doubt. We therefore reverse Mr. McKenzie's conviction.

## FACTS

On July 29, 2018, Andre Devoun McKenzie, a 27-year-old Black man, was perusing the dating application Skout when he came across the profile for a white female named "'Samantha.'" 4 Report of Proceedings (RP) (Dec. 12, 2019) at 150; 5 RP (Dec. 16, 2019) at 171-72. Samantha's profile listed her age as 18, her username as "'petiteprincess2005,'" and stated "'Fun Times. My age is wrong. Daddy wanted.'" 5 RP (Dec. 16, 2019) at 171-73. Samantha was actually a fictional person created by Detective Carlos Rodriguez of the Washington State Patrol's missing and exploited children's task force. The task force conducts undercover investigations to find sexual predators in part by using fictional profiles on social media and dating websites.

No. 38555-8-III
*State v. McKenzie*

The profile picture Mr. McKenzie viewed was that of an undercover female officer who was at least 22 years old.

*The sting*

Mr. McKenzie initiated the conversation with Samantha by messaging "What you up to beautiful??" and then a few minutes later, "Daddy here." Ex. 3 at 1.[1] Samantha responded "Swoop me up. Do you like little girls," to which Mr. McKenzie replied "Not really i just seen it says 18," "If only you was 21!" and "I don't know how you feel about that subject though you look 22!" *Id*. at 2. Shortly thereafter, Mr. McKenzie followed up with "You must have a daddy because you too beautiful not too." *Id*. at 2. Mr. McKenzie inquired about why Samantha did not currently have a "daddy" and Samantha replied "I'm 13 daddy" and "Guys too afraid to step to me." *Id*. Mr. McKenzie replied with a "dizzy face" emoji[2] showing a face with crossed-out eyes, 😵,[3] and asked

---

[1] With regard to exhibits containing the messaging between Mr. McKenzie and "Samantha," we have left any spelling, grammar, or punctuation errors as found in the original. We intend no disrespect by doing so.

[2] *Full Emoji List, v11.0*, UNICODE, http://www.unicode.org/emoji/charts-11.0/full-emoji-list.html (last updated Dec. 19, 2018). "Unicode is the leading organization attempting to standardize emojis." Eric Goldman, *Emojis and the Law*, 93 WASH. L. REV. 1227, 1232 (2018).

[3] "A yellow face with X's for eyes and a round, open mouth . . . [m]ay convey a heightened or hyperbolic sense of such feelings as shock, surprise, disbelief, awe, and amazement, as if staggered to the point of disorientation." *Face with Crossed-Out Eyes*, EMOJIPEDIA, https://emojipedia.org/dizzy-face/ (last visited April 18, 2022).

"13?" and "Oh no." *Id*. at 2-3. Mr. McKenzie then stated that Samantha looked 22.

Samantha then sent three successive emojis—a "face blowing a kiss" 😘,[4] followed by

two "shushing face[s]" 🤫.[5] *Id*. at 3. Mr. McKenzie replied with a "zipper mouth face"

emoji, 🤐.[6] *Id*. Mr. McKenzie then asked "Whats the oldest daddy you had?" and

Samantha replied that she "had a grandpa looking guy once." *Id*.

The two continued to chat on Skout and then moved to text messaging on their

phones. Samantha turned the discussion to "hustling." Mr. McKenzie asked Samantha

why she was involved in hustling. Samantha responded that her "mom is a bitch and

really doesn't care about me or my lil bro. i stay mostly with my gf and do what I need

to." Ex. 4 at 3. Mr. McKenzie then told Samantha she was too young and beautiful to

be "doing what you do." *Id*. The two then discussed Samantha's previous boyfriends and

---

[4] "A yellow face winking with puckered lips blowing a kiss, depicted as a small, red heart . . . [m]ay represent a kiss goodbye or good night and convey feelings of love and affection more generally." *Face Blowing a Kiss*, EMOJIPEDIA, https://emojipedia.org/face-blowing-a-kiss/ (last visited April 18, 2022).

[5] "A yellow face placing an index finger over pursed lips, as if issuing *Shh!* or *Shush!* for silence . . . [m]ay convey silence, quiet, secrecy, and discreetness [and] also create a sense or buzz and anticipation." *Shushing Face*, EMOJIPEDIA, https://emojipedia.org/shushing-face/ (last visited April 18, 2022).

[6] "A yellow face with simple, open eyes and a closed zipper for a mouth . . . commonly conveys a secret that someone will keep [or will] be used to tell someone to stop talking." *Zipper-Mouth Face*, EMOJIPEDIA, https://emojipedia.org/zipper-mouth-face/ (last visited April 18, 2022).

she informed Mr. McKenzie that her relationship with her first boyfriend had lasted only a few weeks, and her longest boyfriend relationship was six months. Samantha then asked Mr. McKenzie if he actually thought she was beautiful or if he was just trying to have sex with her. Mr. McKenzie replied, "No i legit think your beautiful like in thought you was 22 when it said 18." *Id*. He then told Samantha, "We don't have to do anything i never pressure anyone into anything im cool with most things." *Id*.

Samantha later messaged Mr. McKenzie that she had alcohol left over from the night before and the two discussed what she was like when intoxicated. In response to Samantha's statement that she helped pay rent, Mr. McKenzie commented, "Yall really doing adult shit" and, "Well for whatever its worth im proud of yall for doing what you have to do to live. I don't condone it but im not against it either." *Id*. at 6.

During the text messaging, Samantha asked Mr. McKenzie if he was interested in being her pimp to which he replied, "Oh nah im not doing all that," "Thats low. I dont need that & dont have time for all that. If you have a way to get money I support that," and "But pimping? No thanks missed me with that one." *Id*. at 9.

Samantha made repeated suggestions that she and Mr. McKenzie meet up. The two discussed where to meet and Mr. McKenzie expressed concern that Samantha was

5

"setting [him] up." *Id*. at 11. Later Mr. McKenzie asked Samantha about whether she had condoms.

Mr. McKenzie drove from Seattle to Puyallup and waited for Samantha at an agreed meet location for just under 30 minutes. Unbeknownst to Mr. McKenzie, he was under surveillance the entire time he waited. After Mr. McKenzie messaged Samantha that he was giving up and leaving, law enforcement surrounded Mr. McKenzie's car and placed him under arrest. A search of Mr. McKenzie's car revealed a box of condoms on the passenger seat.

*The prosecution*

The State charged Mr. McKenzie with one count of attempted second degree rape of a child and one count of communication with a minor for immoral purposes. Mr. McKenzie exercised his right to a jury trial.

The State's primary trial witness was Detective Carlos Rodriguez, the officer who communicated with Mr. McKenzie as Samantha. In addition to explaining the contents of the messaging, Detective Rodriguez testified about the meanings of various terms commonly used in sex trafficking. One term that drew particular focus was "'Daddy.'" 5 RP (Dec. 16, 2019) at 174-75. According to Detective Rodriguez, "Daddy"

can have two meanings. It can refer to an older person looking to engage a younger person in sexual relations. It can also be used to refer to a pimp.

On cross-examination, the defense questioned Detective Rodriguez about whether Mr. McKenzie appeared interested in acting as a pimp. The defense drew Detective Rodriguez's attention to various points in the chat where Mr. McKenzie expressly stated he was not interested in pimping. At one point, defense counsel stated, "I mean he's very clear that he's not interested in pimping her or being a pimp." 5 RP (Dec. 16, 2019) at 35.[7] Detective Rodriguez responded, "That's what he says." *Id.*

On redirect examination, the State continued to question Detective Rodriguez about Mr. McKenzie's possible interest in pimping. The prosecutor initiated the following exchange:

Q: Are you familiar with the terms gorilla pimp and romance pimp?
A: Yes.
Q: What are those?
A: A gorilla pimp is someone who is very aggressive. They're very direct. They're going to tell you what they want. "This is what you're going to do."

    I've had them try to get me or the people they're victimizing to pay them for that. For them to be sexually exploited, they actually want the victim to pay them for it.

---

[7] There is a second volume 5 of the report of proceedings from trial. Each volume 5 covers a portion of the proceedings on December 16, 2019. The second volume contains 50 pages from the afternoon of December 16 and is paginated independently of the other 13 consecutively paginated volumes of trial proceedings.

> As far as a romance pimp, they're going to come across as your boyfriend or your friend. They're going to romance you, get you into the situation where then they have control. They can continue to play the romance role or they can switch to a more aggressive pimp or they can go back and forth.

Q: So they're not mutually exclusive?

A: No.

Q: The romance pimp angle can be used to gain confidence with a young person. And then once you're engaged with them, the roles can change?
> [DEFENSE COUNSEL]: Your Honor, leading.
> THE COURT: Sustained.

Q: Can the roles change once they're engaged?

A: Yes.

Q: Do Mr. McKenzie's answers about, "I'm not into that. I would treat you right," all of those kind of things, do they negate the possibility that he is looking to put Sam out?

A: No.

*Id*. at 40-41. The defense never voiced a specific objection to the gorilla pimp concept.

The prosecutor made no further reference to it.

Mr. McKenzie testified in his own defense. He claimed to not believe Samantha was 13 years old. Based on her Skout profile pictures, Mr. McKenzie thought Samantha was actually an adult. According to Mr. McKenzie, he would never have had sex with Samantha if, upon meeting her in person, he believed she was a juvenile.

Mr. McKenzie also addressed his understanding of the term "Daddy." Mr. McKenzie explained that he grew up in northern Virginia "in neighborhoods that were full of African Americans and Hispanics." 6 RP (Dec. 17, 2019) at 323. He was also

heavily influenced by hip-hop culture. According to Mr. McKenzie, in his community

"Daddy" was "pretty much an everyday word" that could refer to a boyfriend or "a

man [who] wants to feel like he's everything that a woman could possibly want." *Id*.

Mr. McKenzie denied sharing Detective Rodriguez's understanding of the term.

According to Mr. McKenzie, he uses "Daddy" to refer to an "Alpha male." *Id*.

A jury found Mr. McKenzie guilty as charged. The court subsequently imposed

a standard range sentence of 76.5 months to life in prison, with credit for time already

served.

Mr. McKenzie timely appeals, raising numerous claims of error. A Division

Three panel considered Mr. McKenzie's appeal with oral argument after receipt of an

administrative transfer of the case from Division Two.

In the published portion of this opinion, we limit our review to Mr. McKenzie's

argument that the prosecutor engaged in misconduct by injecting the racially charged term

"gorilla pimp" into the trial.

ANALYSIS

A defendant raising a claim of prosecutorial misconduct for the first time on

appeal usually faces a high burden. Not only must the defendant show improper conduct

and prejudice, but they must also demonstrate that the prosecutor's actions were "so

flagrant and ill intentioned that an instruction could not have cured the resulting prejudice." *State v. Emery*, 174 Wn.2d 741, 760-61, 278 P.3d 653 (2012).

But things are different when the prosecutor's misconduct involves an appeal to racism. Even in the absence of an objection, we will generally reverse a conviction based on a prosecutor's improper injection of racist comments into trial. *State v. Loughbom*, 196 Wn.2d 64, 74, 470 P.3d 499 (2020). "[R]ace-based prosecutorial misconduct shakes the very foundation of a fair system of justice." *In re Pers. Restraint of Gentry*, 179 Wn.2d 614, 630, 316 P.3d 1020 (2014). When the State injects racist rhetoric into a trial it can only avoid reversal if it can show "beyond a reasonable doubt that the misconduct did not affect the jury's verdict." *State v. Monday*, 171 Wn.2d 667, 680, 257 P.3d 551 (2011).

Mr. McKenzie argues the State's prosecutor violated the prohibition on racist rhetoric by injecting the concept of a "gorilla pimp" into Detective Rodriguez's testimony. While Mr. McKenzie did not object to the prosecutor's conduct on this basis during trial, the gravity of Mr. McKenzie's claim compels us to review his arguments on the merits. The first step of our inquiry is to assess whether the prosecutor engaged in misconduct. If there is misconduct, the second step requires us to assess prejudice.

No. 38555-8-III
*State v. McKenzie*

*Whether the State engaged in misconduct*

This court has recognized that "[t]he use of animal analogies at trial is problematic." *In re Pers. Restraint of Richmond*, 16 Wn. App. 2d 751, 752, 482 P.3d 971 (2021). This is because these analogies often "operate as racist code." *Id*. Racially coded language is insidious in many ways. It is hurtful and silencing to those who readily understand the message. It can also trigger implicit bias for listeners who do not immediately register the significance of what has been said. *See Monday*, 171 Wn.2d at 678-79; *State v. Barajas*, 143 Wn. App. 24, 39, 177 P.3d 106 (2007) ([R]acist rhetoric runs "the risk of engaging the passions and prejudice of the jurors."). Perhaps for these reasons, it is not uncommon for coded language to slide by at trial without objection. Nevertheless, such language "can never be condoned." *Richmond*, 16 Wn. App. 2d at 755.

At this point in our history we should not have to belabor the point that using a gorilla analogy when discussing human behavior, specifically the behavior of a Black man, is clearly racist rhetoric. The practice of dehumanizing Black people by analogizing them to primates has an "odious historical context." *Bennett v. Stirling*, 842 F.3d 319, 324 (4th Cir. 2016). From Europe's colonization of Africa through the eugenics movement at the turn of the 20th century, associating Black people with primates facilitated false

11

beliefs regarding Black people's evolutionary status, biology, and propensity for

hypersexuality and violence. Mark W. Bennett & Victoria C. Plaut, *Looking Criminal*

*and the Presumption of Dangerousness: Afrocentric Facial Features, Skin Tone, and*

*Criminal Justice*, 51 U.C. DAVIS L. REV. 745, 769-72 (2018); Gregory S. Perks &

Danielle C. Heard, *"Assassinate the N*[*xxxxx*] *Ape[]": Obama, Implicit Imagery, and the*

*Dire Consequences of Racist Jokes*, 11 RUTGERS RACE & LAW REV. 259, 269 (2010).

This racist ideology was not purely academic; it spread to mass culture in traveling

shows, zoos and movies such as *King Kong* (RKO Radio Pictures 1933). Bennett & Plaut,

*supra*, at 770-71; Perks & Heard, *supra*, at 275-76. This hurtful mischaracterization of

Black people has been deeply embedded and continues to this day. Bennett & Plaut,

*supra*, at 772; Perks & Heard, *supra*, at 278-79; *see also* Brent Staples, *The Racist Trope*

*That Won't Die*, N.Y. TIMES, June 17, 2018,

https://www.nytimes.com/2018/06/17/opinion/

roseanne-racism-blacks-apes.html (last visited Apr. 18, 2022).

The State appears to claim that it did not invoke a racist animal analogy because

the court reporter mistakenly transcribed what should have been "guerilla" pimp as

"gorilla" pimp in the report of proceedings. This is unconvincing. A "guerilla" is

someone engaged in irregular, covert warfare. *See* WEBSTER'S THIRD NEW

INTERNATIONAL DICTIONARY 1008 (1993). "Guerilla warfare" is "carried out by small

forces [behind] enemy [lines] with the object of harassing the enemy, interrupting . . .

lines of communication, and destroying supplies." *Id*. Meanwhile, gorillas are the largest

of the living primates, often associated with violent aggression.[8] Detective Rodriguez's

gorilla pimp discussion centered on aggressive behavior. A reasonable person listening to

Detective Rodriguez would understand his description of a gorilla pimp to be related to

animal-like behavior, not the activity of some military combatant.

The State also argues the term "gorilla pimp" is not racist rhetoric because it is

commonly used in the sex trafficking industry. *See, e.g.*, SHARED HOPE INT'L, *Trafficking

Terms*, https://sharedhope.org/the-problem/trafficking-terms/ (last visited Apr. 18, 2022).

Again, we are not persuaded. It is not uncommon for individuals involved in criminal

enterprises to use racialized language that is sometimes offensive. That is no excuse for

outsiders to do the same. If an individual involved in sex trafficking uses the term "gorilla

pimp" during an undercover operation or (unprompted) during testimony at trial, it would

likely be appropriate for a law enforcement expert to then explain the meaning of the

---

[8] A "gorilla" is a powerfully built great ape with "massive bones, broad
shoulders, very long arms, with prominent canine teeth, a nose with a median ridge,
small ears, and a face covered with black skin." WEBSTER'S, *supra*, at 981. A "gorilla"
is also defined as "an ugly brute of a man **b** *slang* **:** a strong-arm man **:** THUG, GOON
<the employment of [gorillas] for purposes of intimidation —C.A. Madison>." *Id*.

term. But there is no need or excuse for professionals such as law enforcement or prosecutors to perpetuate the harmful simianization of Black men by using the term gorilla pimp.

The State points out that the mere mention of race during trial does not always rise to the level of misconduct. *In re Pers. Restraint of Sandoval*, 189 Wn.2d 811, 834, 408 P.3d 675 (2018). Heightened scrutiny of the prosecutor's conduct "applies only when a prosecutor mentions race in an effort to appeal to a juror's potential racial bias, i.e., to support assertions based on stereotypes rather than evidence." *Id*.

This is not a case where the State can avoid heightened scrutiny. Invoking the idea of a gorilla pimp is not the same as merely mentioning race. Gorilla pimp is an offensive term that had no place in Mr. McKenzie's trial. To the extent the prosecution believed it was necessary to discuss pimping as it related to the use of the term "Daddy," and Samantha's references to hustling, there was no need to bring up the idea of a gorilla pimp. The term "gorilla pimp" was never used during the undercover communications, nor was it volunteered by a witness during trial. Invoking the concept of a gorilla pimp at trial by the prosecutor served no purpose other than to dehumanize and demean Mr. McKenzie.

No. 38555-8-III
*State v. McKenzie*

We note this appears not to be the first time the prosecutor in Mr. McKenzie's case has utilized inflammatory stereotyping, leading to reversal of a conviction. In *State v. Tarrer*, No. 41347-7-II, slip op. at 14-17 (Wash. Ct. App. Apr. 2, 2013) (unpublished), https://www.courts.wa.gov/opinions/pdf/D2%2041347-7-II%20Unpublished%20 Opinion.pdf, this court reversed a conviction based on this prosecutor's actions in bringing up the September 11, 2001, terrorist attacks and invoking patriotism during the trial of a Muslim man.[9] *See* Adam Lynn, *Six Cases of 'Prosecutorial Misconduct'*, TACOMA NEWS TRIB., April 19, 2015. More recently, in *State v. Ellis*, No. 53691-9-II (Wash. Ct. App. Aug. 31, 2021) (unpublished), https://www.courts.wa.gov/opinions/ pdf/D2%2053691-9-II%20Unpublished%20Opinion.pdf, we reversed a conviction after this prosecutor referenced O.J. Simpson and negative racial stereotypes during jury selection in the trial of a Black man accused of murdering his white girlfriend. *See* Alexis Krell, *Murder Conviction Overturned Due to Pierce County Prosecutor's Use of 'Racist Stereotypes'*, TACOMA NEWS TRIB., Sept. 6, 2021.

We agree with Mr. McKenzie that the prosecutor's introduction of the term "gorilla pimp" into trial was misconduct in the form of an improper appeal to racial bias.

---

[9] At least two of the jurors knew of the defendant's faith because they had seen a news story detailing his religious discrimination lawsuit. *Tarrer*, slip op. at 2 n.5.

15

We therefore turn to the question of prejudice.

*Prejudice*

As previously stated, the State has the burden of proving that misconduct based on racialized rhetoric is harmless beyond a reasonable doubt. *Monday*, 171 Wn.2d at 680. The State claims this burden is met because the gorilla pimp reference was an isolated part of the questioning of Detective Rodriguez and was not repeated in summation. While the State's summary of the record is accurate, it is insufficient to overcome the presumption of prejudice.

Mr. McKenzie's case involved the trial of a Black man accused of attempting to have sex with a 13-year-old white girl. This factual backdrop alone presented unavoidable racial overtones. A disputed issue at trial was the meaning of the term "Daddy." Mr. McKenzie referenced his African American community and hip-hop culture in explaining that he understood "Daddy" to refer to a boyfriend or alpha male. The State's position was that "Daddy" referred to either an adult male interested in an underage female or a pimp. By associating the term "Daddy" with the term "gorilla pimp," the State improperly infused the jury's assessment of whether to credit Mr. McKenzie's testimony with a dehumanizing characterization of Black men. The timbre of this racist bell cannot be unrung.

16

The type of racist rhetoric invoked by the State appears to have especially strong pull. A six-year study of undergraduates at Stanford University and Pennsylvania State University showed young people are swayed by Black-ape associations, even when they claim to know nothing about the historical context of racist simianization. *Discrimination against Blacks Linked to Dehumanization, Study Finds*, STAN. NEWS SERV., Feb. 7, 2008, https://news.stanford.edu/pr/2008/pr-eber-021308.html (last visited April 18, 2022). According to this study, undergraduates who were exposed to words associated with apes were more likely to condone the beating of those in police custody when they thought the suspect was Black. *Id.* Another study analyzed death penalty cases covered in the *Philadelphia Inquirer* newspaper between 1979 and 1999, and found that Black defendants convicted of capital crimes were four times more likely than whites convicted of capital crimes to be described with labels associated with apes. *Id.*

Given the visceral strength of the gorilla analogy, the parties' dispute over Mr. McKenzie's credibility and the racial overtones imbued in the contested word "Daddy," we cannot say that the State's injection of racist rhetoric into Mr. McKenzie's trial was harmless beyond a reasonable doubt. Although the prosecutor here made only a brief reference to the concept of a gorilla pimp during Mr. McKenzie's trial, "[l]ike wolves

in sheep's clothing, a careful word here and there can trigger racial bias." *Monday*, 171 Wn.2d at 678-79. The State has failed its burden of proving this type of triggering did not improperly infect Mr. McKenzie's trial.

A criminal conviction cannot rest on a foundation of racism. The judgment of conviction is reversed without prejudice. This matter is remanded to the trial court for further proceedings.

The panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports, and that the remainder having no precedential value shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

Because we are reversing Mr. McKenzie's conviction, we need not address the majority of his remaining assignments of error. However, because Mr. McKenzie has advanced two arguments that if successful would require reversal with prejudice, we address them on their merits.

*Sufficiency of the evidence*

Mr. McKenzie claims the State failed to produce sufficient evidence to justify his convictions. With respect to both convictions, Mr. McKenzie claims there was

insufficient evidence to show he believed Samantha was under the age of consent. With respect to the conviction for attempted rape of a child, Mr. McKenzie additionally claims there was insufficient evidence to show he took a substantial step toward having sexual intercourse with a child. We disagree with both claims.

The State presented ample evidence from which the jury could conclude that Mr. McKenzie intended to have sexual intercourse with an individual under the age of 14. "Samantha" portrayed herself as 13 years old and Mr. McKenzie's messaging with her could be read as demonstrating his acceptance of this as her age. While Mr. McKenzie testified that he did not believe Samantha was under 16 years of age, the jury was not required to accept his testimony.

The State also presented sufficient evidence that Mr. McKenzie took a substantial step toward his attempt to have sexual intercourse with Samantha. Mr. McKenzie drove a significant distance to meet with her. He also had a box of condoms with him on the front seat of his car.

As an appellate court, we will not second-guess the jury's credibility determinations or its assessment of the weight of the evidence. The State presented sufficient evidence to justify the jury's verdict.

*Constitutional right to speedy trial*

In a statement of additional grounds for review, Mr. McKenzie argues he was deprived of his constitutional right to a speedy trial. Mr. McKenzie was arrested on July 30, 2018, and remained in custody for just under 500 days prior to trial commencing on December 9, 2019. Mr. McKenzie's trial date had been continued 11 times. While Mr. McKenzie personally objected to eight of those continuances, his attorney joined in all continuance requests save three.

We review de novo the question of whether pretrial delay violated a defendant's constitutional right to speedy trial. *State v. Ollivier*, 178 Wn.2d 813, 826, 312 P.3d 1 (2013). When delay in a particular case approaches or exceeds the one-year mark, we will apply a balancing test to determine whether there has been a deprivation of the right to speedy trial. *See Barker v. Wingo*, 407 U.S. 514, 529-30, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972); *State v. Corrado*, 94 Wn. App. 228, 233-34, 972 P.2d 515 (1999). The components of the balancing test are (1) the length of the delay, (2) the reason for the delay, (3) the defendant's assertion of his right, and (4) prejudice to the defendant. *Barker*, 407 U.S. at 530.

Here, the length of delay requires us to invoke the balancing test. Our assessment of the four applicable factors is as follows:

- The 16-month delay between Mr. McKenzie's arrest and the commencement of trial was not unusually long. In fact, it was only slightly longer than necessary to trigger the four-factor balancing test.

- Most of the delay was chargeable to the defense. Although Mr. McKenzie himself consistently objected to the delays, his attorney joined in most of the continuance requests based on scheduling conflicts caused by other trials and the need for further preparation. "Delay caused by defense counsel is chargeable to the defendant." *Ollivier*, 178 Wn.2d at 832. To the extent the State alone asked for delays, there is no indication the State's requests were made in bad faith or the result of inexcusable inefficiency.

- Mr. McKenzie personally objected to the majority of the continuances.

- Mr. McKenzie has not pointed to any specific prejudice caused by the delay in going to trial. Given he has not been subjected to extreme delay, incarceration alone is insufficient to establish prejudice. *Id.* at 842-44.

The balance of the foregoing factors weigh against Mr. McKenzie's claim of a constitutional speedy trial violation. He has therefore not shown a basis for reversing his convictions with prejudice.

No. 38555-8-III
*State v. McKenzie*

CONCLUSION

The judgment of conviction is reversed without prejudice. This matter is remanded

to the trial court for further proceedings.

Pennell, J.

WE CONCUR:

Lawrence-Berrey, A.C.J.

Johnson, J.P.T.[10]

---

[10] The Honorable Brandon L. Johnson, a judge of the Superior Court of the State of Washington, in and for the County of Walla Walla, has been designated and appointed by order of the Chief Justice of the Supreme Court of Washington to serve as a judge pro tempore of the Washington State Court of Appeals, Division Three, pursuant to CAR 21(c).

22