

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 39282-1-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| AVERY L. LORING, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

STAAB, A.C.J. — Avery Loring appeals his convictions for first degree robbery

and second degree promoting prostitution. He contends that the trial court abused its

discretion in finding that a detective was qualified as an expert witness on the subject of

human trafficking and that such testimony was helpful to the trier of fact. He also argues

the prosecutor committed race-based misconduct when the detective used the term

"gorilla pimp" when describing different types of pimps. Finally, he contends the

cumulative error deprived him of a fair trial. Loring also raises additional claims in a

statement of additional grounds. We find no error and affirm.

BACKGROUND

The victim in this case, A.V., met Avery Loring while she was visiting Spokane

from the Tri-Cities. A.V. believed that she had discussed prostitution when they met, and

admitted having prior experience with prostitution. After A.V. returned to the Tri-Cities, Loring contacted her on Facebook and offered to work with her as a team to make money from her prostitution services.

Loring then drove down to the Tri-Cities, picked up A.V., and drove back to Spokane. Loring helped A.V. write and post online advertisements for prostitution. Once in Spokane, Loring drove A.V. to two locations so that A.V. could perform prostitution services.

A.V. and Loring stayed in hotels in Spokane for two nights. On the third day, A.V. expected Loring to drive her back to the Tri-Cities but instead he drove her to a trailhead, pulled out a gun, and asked A.V. about the money she had collected before taking her wallet and shoving her out of the vehicle. Police subsequently arrived.

The State charged Loring with first degree robbery and second degree promoting prostitution, and the case proceeded to a jury trial.

*A.V.'s Testimony*

At trial, the State introduced evidence to show that Loring was actively engaged in promoting prostitution services. A.V. testified that shortly after they met, Loring contacted her on Facebook and offered to partner with her to make money using her prostitution services. The State admitted a printout of these initial messages. In the messages, Loring told A.V. "I know you're tired of being broke, so I am going to help you out. We just got to work as a team. You've known me. I got you 100, though."

2

Rep. of Proc. (RP) (Apr. 13, 2022) at 41.  He later said, "I know you tired of the shit you've been dealing with.  Let me put you in position.  Come to Spokane."  RP (Apr. 13, 2022) at 42.  Loring offered to pick A.V. up from the Tri-Cities and bring her to Spokane.

Loring and A.V. then discussed how much money she could make, and Loring told her, "[Y]ou can make five bands in one night."  RP (Apr. 13, 2022) at 47.  Loring also said that the charge for a "quick visit" was "like 100" while an hour-long visit was "between 350 to 500."  Ex. 7 at 11.  Loring told A.V. she would be doing "outcalls," and she replied that she did "outcall[s] and incall[s]."  Ex. 7 at 12.

A.V. explained that a band was more money "than what you would want in your pocket . . . [m]ore like it should be in a bank."  RP (Apr. 13, 2022) at 47.  She also explained that a "quick visit" lasted about 10 minutes and an "outcall" was where she would go to the customer's location.  RP (Apr. 13, 2022) at 48, 52.

Once Loring convinced A.V. to work with him, he encouraged A.V. to post ads for prostitution services online.  A.V. created ads with pictures and testified that Loring helped her with the wording.

After picking A.V. up in Kennewick, Loring and A.V. drove to a truck stop where she had arranged to meet up with someone who had responded to her ad and was looking for prostitution services.  After she had met up with a man at the truck stop, Loring drove A.V. to a motor home for the same reason.  A.V. did not perform any sexual acts during either of these meetings, but she testified that both men paid her money after she

explained to them that she really did not want to do it, but was trying to get money to go home.

A.V. then paid for a motel room for two nights for her and Loring. A.V. testified that she saw Loring sleeping with a gun and this frightened her.

On the third day together, A.V. testified that Loring drove her to a more remote area near a trail. Wielding his firearm, Loring accused A.V. of withholding money from him from the prostitution serviced. At some point, Loring pointed the firearm at A.V. and she started screaming, "Gun, gun, gun." RP (Apr. 13, 2022) at 76-78. Loring was also yelling at her. He then pushed her out of the vehicle while it was moving. As a result of the incident, A.V. said she had scratches on her lower back and "a big scar on [her] elbow that [she] couldn't move." RP (Apr. 13, 2022) at 83. Photos of these injuries were admitted into evidence.

During cross-examination, defense counsel asked A.V. about prior inconsistent statements she had made regarding the events in question including providing different dates for when she had met Loring, saying that she had not gone to Spokane to make money or for prostitution, and statements she had made about the amount of money she earned from her prostitution services. A.V. said that once she arrived in Spokane, she was afraid of Loring and felt she had made a mistake in coming to Spokane but said that no one was available to come get her.

*Detective Richard Johnson's Testimony*

The State filed an expert witness proffer requesting to call Det. Johnson, deputy sheriff for Spokane County, as an expert witness "on human trafficking and other topics related to promoting prostitution." Clerk's Papers at 72. Attached to the State's proffer was Det. Johnson's curriculum vitae, which stated that he had worked as an officer on the FBI Child Exploitation and Human Trafficking Task Force for more than three years and attended multiple trainings related to human trafficking.

Defense counsel objected, arguing that the testimony was inadmissible under ER 702 because the subject of prostitution was common knowledge and expert testimony was not necessary. Defense counsel also argued that the testimony was inadmissible under ER 403 as the probative value of the testimony was outweighed by the danger of unfair prejudice.

After considering argument on the issue, the trial court noted that human trafficking was not a common topic and that some of the nomenclature and discussion around it would not make sense to the ordinary citizen. The trial court found Det. Johnson's testimony would be helpful in clearing up confusion and he clearly had the experience, training, and education to testify as an expert. The trial court also found the testimony was not inadmissible under ER 403. Accordingly, the trial court accepted the State's proffer and allowed Det. Johnson to testify as an expert.

5

Det. Johnson subsequently testified during trial. He explained that he worked at an FBI office where he was assigned to the Child Endangerment/Human Trafficking Task Force. As part of Det. Johnson's work and the trainings he had attended, he learned terminology commonly used in human trafficking. He explained that terminology was a "big thing in this particular line of work" and it was necessary to "spend of lot of time getting familiar with terms, websites, subcultures, areas." RP (Apr. 13, 2022) at 271-72.

Det. Johnson testified that he had reviewed the Facebook messages between Loring and A.V. and said that the language used by Loring caught his attention as it was "familiar." RP (Apr. 13, 2022) at 281-82. He noted that Loring had asked A.V. whether she was tired of her financial situation and was building her up by saying things like, "I believe in you. I know we can do this. . . . I've got your back, as long as you're loyal to me." RP (Apr. 13, 2022) at 282.

Det. Johnson explained that the relationship between a trafficker and sex worker can vary, but often the sex worker will think it is a romantic relationship while the trafficker may see it as a business and a way to make money. The State asked Det. Johnson whether there were different types of traffickers, and he responded affirmatively. The following exchange then occurred:

Q: What are some of the general types?

A: The two main types are what referred to as a romeo pimp and a gorilla pimp. A romeo pimp is a trafficker that is very smooth-talking. He will try to reassure the victim they're a great person, that they're there to help them.

They can do this together.  They can build a life together.  Whereas a gorilla pimp comes off as very strong, very physical, very in-your-face.  If you don't do what you're supposed to do, if you're not loyal to me, there will be consequences and those consequences most often are some sort of physical abuse.

Q: Did you see Mr. Loring utilizing some of the techniques associated with being a romeo pimp?

A: I did.

Q: What did you see?

A: Again, the, "I'm here to help.  We can do this together.  We can get you a better life. We're a team," you know, just trying to build her up and including himself, that I will be right there with you along the way.

RP (Apr. 13, 2022) at 284-85.  Apart from this testimony, the term "gorilla pimp" was not repeated again during Loring's trial.

Det. Johnson then went on to describe the terminology used by traffickers and the terminology Loring had employed in his communications with A.V.  He explained that a "band" usually referred to $1,000 and a "quick visit", abbreviated "QV," usually was a commercial sex date lasting no more than 15 minutes.  RP (Apr. 13, 2022) at 285-287. He also said that an "outcall" was when a commercial sex worker goes to the buyer's location.  Det. Johnson further testified that it was fairly common for a woman acting as a prostitute to receive money for services other than sex.

7

*Additional Corroborating Testimony and Evidence*

Two other witnesses who were present at the trail area during the alleged robbery also testified at trial. The first witness said that he heard raised voices coming from a vehicle containing a male and female, and the female appeared to fall out of the vehicle. He also stated that he saw the male holding a firearm.

The second witness said that he heard a loud female voice that sounded distressed, and the female fell out of the passenger side of the vehicle while it was moving. He provided a partial license plate and description of the vehicle to a 911 operator, and this description was later matched to Loring's vehicle.

Law enforcement officers also testified regarding the subsequent investigation into A.V.'s allegations. They were able to confirm that Loring and A.V. had stayed two nights at a Motel 6 together on the days that A.V. claimed to have come to Spokane for prostitution. Law enforcement also found records showing that Loring's vehicle had travelled from Washington to Idaho on the date when A.V. stated she had offered prostitution services at a truck stop that police believed was located in Idaho.

The jury found Loring guilty of first degree robbery and second degree promoting prostitution.

Loring appeals.

ANALYSIS

1.    ADMISSION OF EXPERT TESTIMONY

Loring contends that the trial court abused its discretion by finding Det. Johnson was qualified as an expert witness and that his testimony was helpful to the trier of fact. We review a trial court's decision to admit expert testimony for a clear abuse of discretion. *State v. Arndt*, 194 Wn.2d 784, 799, 453 P.3d 696 (2019). A trial court abuses its discretion where its exercise of discretion is "'manifestly unreasonable or based upon untenable grounds or reasons.'" *State v. Darden*, 145 Wn.2d 612, 619, 41 P.3d 1189 (2002) (quoting *State v. Powell*, 126 Wn.2d 244, 258, 893 P.2d 615 (1995)). "Specifically, an abuse of discretion can be found when the trial court 'relies on unsupported facts, takes a view that no reasonable person would take, applies the wrong legal standard, or bases its ruling on an erroneous view of the law.'" *Arndt*, 194 Wn.2d at 799 (quoting *State v. Lord*, 161 Wn.2d 276, 284, 165 P.3d 1251 (2007)).

ER 702 governs the admissibility of expert testimony. The rule states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Determining admissibility of expert testimony requires consideration of two factors: "(1) does the witness qualify as an expert; and (2) would the witness's testimony be helpful to the trier of fact." *State v. Guilliot*, 106 Wn. App. 355, 363, 22 P.3d 1266 (2001).

Evidence is helpful to the trier of fact where "'testimony concerns matters beyond the common knowledge of the average layperson, and does not mislead the jury to the prejudice of the opposing party.'" *Id.* (internal quotation marks omitted) (quoting *State v. Farr-Lenzini*, 93 Wn. App. 453, 461, 970 P.2d 313 (1999)). "'Courts generally interpret possible helpfulness to the trier of fact broadly and will favor admissibility in doubtful cases.'" *State v. Groth*, 163 Wn. App. 548, 564, 261 P.3d 183 (2011) (internal quotation marks omitted) (quoting *Moore v. Hagge*, 158 Wn. App. 137, 155, 241 P.3d 787 (2010)).

Loring appears to argue that Det. Johnson was not qualified to testify as an expert witness on the subject matter of prostitution because his curriculum vitae did not set out a sufficient basis for him to be declared an expert witness. Defense counsel did not object to Det. Johnson's qualifications as an expert witness and so this argument is waived. *See* RAP 2.5(a). Had Loring objected, the State would have had the opportunity to supplement the record with any noted deficiencies. Moreover, the foundation of the argument appears to be an assertion that to qualify as an expert witness sufficient basis for the expert testimony must be set out in a curriculum vitae. However, Loring provides no legal support for this assertion and we decline to address it. *See* RAP 10.3(a); *Regan v. McLachlan*, 163 Wn. App. 171, 178, 257 P.3d 1122 (2011) ("We will not address issues raised without proper citation to legal authority.").

10

Loring also argues that the detective's opinion testimony was not helpful to the trier of fact because prostitution is common knowledge. The trial court's decision to the contrary was not an abuse of discretion. The court determined that the testimony was helpful to the trier of fact because language used in sex trafficking and the nuances surrounding the pimp-prostitute relationship are not commonly known to the everyday person. Human trafficking is not an issue that the average individual regularly comes into contact with and therefore, as the trial court found, some of the nomenclature and discussion around human trafficking does not make sense to the ordinary citizen. Det. Johnson's testimony was helpful to the trier of fact because it provided information regarding the subculture of human trafficking and the terminology commonly used therein.

2.      USE OF THE PHRASE "GORILLA PIMP"

Loring contends that the prosecutor committed race-based misconduct and impinged on his right to a fair trial when Det. Johnson testified that there were two types of traffickers: "gorilla pimps" and "romeo pimps." While the term "gorilla pimp" is racially insensitive and perpetuates harmful stereotypes, in this case the prosecutor did not flagrantly or apparently intentionally use the term to appeal to the jury's potential racial bias.

A prosecutor commits misconduct and violates a defendant's right to a fair trial under article I, section 22 of the Washington State Constitution when the prosecutor

"resorts to racist argument and appeals to racial stereotypes or racial bias to achieve convictions." *State v. Monday*, 171 Wn.2d 667, 676, 257 P.3d 551 (2011).

When a defendant makes a claim of race-based misconduct the general rule—that unchallenged misconduct is not reversible unless it is incurable—does not apply. *State v. Bagby*, 200 Wn.2d 777, 788, 522 P.3d 982 (2023). Instead, "to prevail on a claim of race-based prosecutorial misconduct, the defendant must demonstrate that the prosecutor's conduct was both improper and prejudicial by showing that they *flagrantly or apparently intentionally* appealed to racial bias in a manner that undermined the defendant's credibility or the presumption of innocence." *Id.* at 790.

Under this "flagrant or apparently intentional" standard, prejudice is presumed if misconduct is demonstrated. *Id.* at 790-91. Moreover, the prosecutor's subjective intent is irrelevant. *Id.* at 791. Instead, "we ask whether an objective observer could view the prosecutor's questions and comments as an appeal to jurors' potential prejudice, bias, or stereotypes in a manner that undermined the defendant's credibility or the presumption of innocence." *Id.* at 793. In applying this objective observer standard, we consider several factors, including "the content and subject of the statements, the frequency of the remarks, the apparent purpose of the statements, and whether the comments were based on evidence or reasonable inferences in the record." *Id.* at 793.

In *Bagby*, the Supreme Court found race-based misconduct after applying these factors to language used by the prosecutor throughout trial. The prosecutor asked almost

every witness to identify the defendant, a Black man, by his "nationality" even though the defendant was American.  On the other hand, the prosecutor repeatedly used the term "citizens" when describing white witnesses.  *Id*. at 795-96.  The prosecutor also referred to witnesses as "'the white guy'" and the defendant as "'the Black [guy].'"  *Id*. at 795. In closing, the prosecutor argued that "'[t]his is a case with a bunch of [G]ood [S]amaritans.  [The defendant] wasn't one of them.'"  *Id*. at 797-98.

Turning to the first factor, the court noted that racially charged language does not have to be overt to evoke bias in jurors.  Instead, subtle "code words" can also trigger implicit biases.  *Id*. at 794-95.  Such coded language can include words suggesting an "us" versus "them" theme, implying that Black defendants are inherently different than white jurors.  *Id*. at 794.  The court noted that the prosecutor's continuous reference to the defendant's nationality, ethnicity, and race "primed the all-white jury to pay more attention" to the racial difference between the defendant and the jurors.  *Id*. at 795. Moreover, "[t]he prosecutor's use of racial identifiers and frequent juxtapositioning of Black versus white further drew attention to [the defendant's] race as a factor in the trial." *Id*. at 796.

With respect to the second factor, the court noted that these comments occurred "frequently" throughout the trial.  Specifically, the State questioned witnesses about the defendant's "'nationality' at least half a dozen times," and asked witnesses to identify the defendant and others "by their race over a dozen times."  *Id.* at 796.

13

Applying the third and fourth factors, the *Bagby* court found that the apparent purpose of using the term "nationality" was to emphasize the defendant's race. *Id*. at 796. The comments were not relevant or based on evidence in the record. Notably, the defendant's identity, citizenship, and race were not at issue during trial. *Id*. at 797. The prosecutor's pattern of treating white witnesses different from Black witnesses was repeated during closing arguments when the prosecutor referred to the white witnesses as "Good Samaritans," but did not identify the one Black witness, who tried to deescalate the situation, as a Good Samaritan. *Id*. at 798.

In the end, the court concluded that the "prosecutor's word choices and themes . . . were an apparent intentional attempt to distinguish [the defendant] based on his race." *Id*. at 801. As such, they were "improper and constitute[d] an apparently intentional appeal to jurors' potential racial bias in a way that undermined [the defendant's] credibility and presumption of innocence." *Id*. at 802.

Even before the Supreme Court's decision in *Bagby*, this court published the factually relevant opinion in *McKenzie*. *State v. McKenzie*, 21 Wn. App. 2d 722, 730, 508 P.3d 205 (2022). In *McKenzie*, we held that the prosecutor's comments during trial, including use of the term "gorilla pimp" amounted to misconduct. In *McKenzie*, the defendant was a Black man accused of targeting a 13-year old white girl that he contacted on a dating website for sexual exploitation. *Id*. at 723-24. The fictitious victim was created by law enforcement using the picture of a 22-year old officer and claimed to be

14

13 and in need of a "daddy." *Id*. at 724. As the conversations between the two progressed, the fictitious victim indicated she liked "hustling" and asked the defendant if he would like to be her pimp. He responded that he had no interest in being a pimp. *Id*. at 725-26. The defendant was later arrested after driving to an agreed location with a box of condoms on his passenger seat. He was charged with attempted second degree rape of a child and communication with a minor for immoral purposes. *Id*. at 726-27.

At trial, the defendant disputed the State's characterization of the evidence. The detective who was communicating with the defendant testified about the meaning of certain terms used in trafficking. He explained that the term "daddy" can have two meanings: it can be a reference to an older person looking for a sexual relationship with a younger person or it can refer to a pimp. *Id*. at 727. On cross-examination, the detective admitted the defendant expressed no interest in being a pimp. On redirect, the prosecuting attorney introduced the concepts of "gorilla pimps" and "romance pimps" and asked the detective to define these terms for the jury. *Id*. at 727. Upon further questioning the detective clarified that these identities are not mutually exclusive and can change over time. In response to a leading question by the prosecutor, the detective indicated that the defendant's comments about treating the victim right did not negate the possibility that he would put the victim "out," presumably to hustle. *Id*. at 728.

The defendant testified on his own behalf and indicated that he did not believe the fictitious victim was under age based on her profile picture. He also stated that in the

15

neighborhoods where he grew up, the term "daddy" simply referred to a boyfriend or a man who "'wants to feel like he's everything that a woman could possibly want.'" *Id*. at 728-29.

Although *McKenzie* was decided before *Bagby*, and thus we did not have the benefit of *Bagby*'s framework, we still considered several of the factors set forth in *Bagby*.[1] As to the content of the challenged statements, we acknowledged that "'[t]he use of animal analogies at trial is problematic'" and often used in racially coded language. *Id*. at 730 (alteration in original) (quoting *In re Pers. Restraint of Richmond*, 16 Wn. App. 2d 751, 752, 482 P.3d 971 (2021)). We noted the historical "practice of dehumanizing Black people by analogizing them to primates," went beyond academia and included racist tropes in films like "*King Kong*" (RKO Radio Pictures 1933). *Id*. at 730, 731. We went on to recognize that "[a]t this point in our history we should not have to belabor the point that using a gorilla analogy when discussing human behavior, specifically the behavior of a Black man, is clearly racist rhetoric." *Id*. at 730. Thus, we found the use of the term "gorilla pimp" by the prosecutor to be offensive and racist rhetoric. *Id*. at 730, 732. But our analysis did not stop here.

---

[1] Although we considered these factors in determining prejudice, *Bagby* clarified that similar factors should be considered in deciding whether there was misconduct. Once race-based misconduct is found, it is per se prejudicial. *Bagby*, 200 Wn.2d at 803.

In determining prejudice, we considered the purpose of using the term and whether it was based on the evidence. We noted that the prosecutor's reference to the terms "gorilla pimp" and "romance pimp" had no purpose in the case. We also recognized that accusations of a Black man attempting to have sex with a white girl already "presented unavoidable racial overtones." *Id*. at 734. The prosecutor's association of the term "daddy" with "gorilla pimp" was an improper attempt to infuse a "dehumanizing characterization of Black men" into the jury's assessment of the defendant's credibility. *Id*. at 734. Based on these factors, including the "visceral strength of the gorilla analogy, the parties' dispute over [the defendant's] credibility, and the racial overtones imbued in the contested word 'Daddy,'" we found the prosecutor's comments to be prejudicial. *Id*. at 735.

Turning to the case at hand, we consider and apply the *Bagby* factors. We continue to adhere to the admonishment that the State must refrain from adopting and using terminology that could be considered code language for racial stereotypes. However, after applying an objective analysis to the facts in this case and the *Bagby* factors, we hold that the reference to a "gorilla pimp" in this case was not a "flagrant or apparently intentional" appeal by the prosecutor to racial bias.

17

As the State concedes, the term "gorilla pimp" is improper when used as a racially charged code word to describe Black men. Mr. Loring is a Black man.[2] However, unlike in *McKenzie*, in this case the prosecutor did not inject the term into the testimony. There is no evidence that the prosecutor's neutral question was intended to evoke the witness's use of a racially charged term. However, even if it this could be implied, we note that after the detective used the term, the prosecutor asked a leading question to suggest that the defendant was a "romeo pimp" and the detective agreed. Loring was not described as a "gorilla pimp," and unlike in *McKenzie*, there was no testimony that the identities were interchangeable.

Next, we consider the frequency of the remarks. Here, the term was said two times, both by the detective in the span of a few sentences. The prosecutor never used the term. The prosecutor did not incorporate the term into his theme of the case or closing arguments. In the context of the entire trial, the reference was minimal.

Finally, we consider the apparent purpose of the statements and whether they were supported by the evidence. Here, the question asked by the prosecutor, "are there different types of pimps?", was relevant and based on evidence in the case. Unlike the defendant in *McKenzie*, Loring was charged with promoting prostitution so his intent to promote prostitution was directly relevant. The testimony was introduced to inform the

---

[2] Statements made by defense counsel at sentencing indicated that Loring is Black. RP (Apr. 13, 2022) at 476-77.

18

jury that pimps and traffickers often use recognized patterns of manipulative behaviors to coerce sex workers to work with them. Unlike in *McKenzie*, the offensive term was not introduced to discredit Loring, who did not testify at his trial.

Here, the detective applied the term "romeo pimp" to Loring's communications with A.V. to show that Loring's actions conformed to a recognized pattern of behavior that was both insincere and coercive. The testimony came up in the context of Det. Johnson summarizing the communications between Loring and A.V. on social media where Loring was encouraging A.V. to work with him as a team to make money. The detective described Loring as a "romeo pimp" and pointed to Loring's comments that Loring and A.V. could work together and have a better life and promised her an opportunity to earn money. Det. Johnson stated that while a trafficker may use language suggesting that the trafficker cares for the sex worker, the motivation is more about money than concern for the sex worker.

Loring argues that this case is factually indistinguishable from our decision in *McKenzie*, 21 Wn. App. 2d 722. We disagree and note there are several differences beyond those noted above. In Loring's trial the prosecutor asked a neutral question, never uttered the term "gorilla pimp," and steered the detective away from the term. In addition, the prosecutor in this case did not have a history of utilizing inflammatory and racist comments during trial and here the adult victim was self-described as non-white, so

while the term "gorilla pimp" was improper, the term was not used as the same racial trope that was present in the *McKenzie* case.

While "the simplest racial cues *can* trigger implicit biases," the introduction of such cues does not automatically result in race-based misconduct. *See State v. Horntvedt*, __ Wn. App. 2d __, 539 P.3d 869, 874 (2023) (emphasis added); *In re Pers. Restraint of Skone*, __ Wn. App. 2d __, 543 P.3d 842, 865 (2024). Instead, we must apply the factors identified in *Bagby* to determine if the prosecutor injected the offensive term as an attempt to flagrantly or apparently intentionally appeal to potential racial prejudice, bias, or stereotypes in a manner that undermined the presumption of innocence. *Bagby*, 200 Wn.2d at 790.

Although we do not find race-based misconduct, we emphasize that the term "gorilla pimp" is one that should be avoided during trial as it will often promote racist stereotypes. Here, even though Loring's trial occurred before our published opinion in *McKenzie*, the prosecutor appears to have steered away from the term and never used it in trial. We do not consider whether the continued use of this term by professionals after *McKenzie* could be considered intentional.[3]

---

[3] Loring also makes reference to cumulative error, but since several issues have been withdrawn and we find no error in the remaining issues, we do not find cumulative error.

3.      STATEMENT OF ADDITIONAL GROUNDS

Loring raises multiple claims in his statement of additional grounds.  We find no error based on the argument raised by Loring.

Loring raises allegations of "*Napue*" violations by the State as it pertains to A.V.'s testimony.  "[A] conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment."  *Napue v. Illinois*, 360 U.S. 264, 269, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959).  "The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears."  *Id*.  "'Mere inconsistency' between witnesses' testimony is not necessarily perjury.'"  *United States v. Martin*, 59 F.3d 767, 770 (8th Cir. 1995) (quoting *United States v. Nelson*, 970 F.2d 439, 443 (8th Cir. 1992)).

At times, Loring summarizes portions of A.V.'s testimony and broadly claims that it was completely false and known to be false to the State.  Loring also points out inconsistencies and gaps in A.V.'s testimony when compared to her prior statements and other witness statements and claims that this demonstrates a *Napue* violation.  However, inconsistency alone is not enough to show testimony was false, and Loring fails to otherwise explain how or why A.V.'s testimony was false.  Thus, this argument fails.

Loring raises several additional claims related to prosecutorial misconduct.  Loring claims the prosecutor committed misconduct during closing argument by vouching for the credibility of A.V.  "Improper vouching occurs when the prosecutor

21

expresses a personal belief in the veracity of a witness or indicates that evidence not presented at trial supports the testimony of a witness." *State v. Thorgerson*, 172 Wn.2d 438, 443, 258 P.3d 43 (2011).

In support of his argument, Loring points to the prosecutor's statement that A.V. appeared, during her testimony, to be "[l]ow-functioning" and to not have a high mental capacity. RP (Apr. 13, 2023) at 375. The prosecutor then noted that a lack of intelligence and the fact that someone is a prostitute does not equate to dishonesty. This was not a statement of the prosecutor's own opinion on A.V.'s credibility.

Loring also claims that the prosecutor's statement regarding A.V.'s mental capacity involved facts and evidence outside the record and was irrelevant. A prosecutor commits misconduct if they reference facts not in evidence. *State v. Fisher*, 165 Wn.2d 727, 747, 202 P.3d 937 (2009). Further, evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable." ER 401. Here, the prosecutor specifically relied on A.V.'s testimony on the stand in making the argument about her credibility, and as A.V. was the victim in this case, her credibility was a central issue and clearly relevant. Thus, these arguments fail.

Loring claims that the prosecutor presented an altered version of testimony in closing argument when he discussed one of the robbery witness' statement that he had seen a gun in Loring's hand and referred to it as "pretty powerful corroboration." RP

(Apr. 13, 2022) at 379. Loring appears to be referring to the fact that a witness, who remembered seeing a firearm at trial, admitted that he had not mentioned a firearm when he had previously spoken with police. The acknowledged inconsistent statements demonstrate inconsistencies that can be used to challenge credibility. But the witness testified to seeing a firearm so it is not misconduct for the prosecutor to point to this evidence in closing.

Finally, Loring contends that the prosecutor improperly expressed a personal opinion about guilt when he said that Loring was "guilty of promoting prostitution in the second degree" and "guilty of first-degree robbery." RP (Apr. 13, 2022) at 387, 384. "'While it is improper for a prosecuting attorney, in argument, to express his individual opinion that the accused is guilty, independent of the testimony in the case, he may nevertheless argue from the testimony that the accused is guilty, and that the testimony convinces him of that fact.'" *State v. McKenzie*, 157 Wn.2d 44, 53, 134 P.3d 221 (2006) (quoting *State v. Armstrong*, 37 Wash. 51, 54, 79 P. 490 (1905)).

Here, both statements raised by Loring were made in the context of arguing the facts and explaining why the facts supported findings of guilt by the jury. There is no indication in either of these statements that the State is communicating its personal opinion. Accordingly, this court should determine that this argument fails.

23

No. 39282-1-III
*State v. Loring*

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Staab, A.C.J.

I CONCUR:

_____
Pennell, J.

FEARING, J. (dissenting) —

> *Gorilla face Michelle, can't disagree with that.  The woman is not attractive except to monkey man Barack.  Check out them ears.  LOL.*  Facebook Post of former Airway Heights Mayor Patrick Rushing (Daniel Walters, *75+ More Questionable Posts by Airway Heights Mayor Patrick Rushing*, INLANDER (July 15, 2015, 4:44 PM), https://www.inlander.com/Bloglander/archives/2015/07/15/75-more-questionable-posts-by-airway-heights-mayor-patrick-rushing).

> *The brutal lust of these half-civilized gorillas seems to be inflamed to madness.*  Rebecca Latimer Felton, first female United States Senator when crusading against the dangers posed to White women by Black men (LEON F. LITWACK, TROUBLE IN MIND: BLACK SOUTHERNERS IN THE AGE OF JIM CROW 213 (1999)).

Because of the State's insertion of the incendiary racist lingo "gorilla pimp" into the trial of African-American Avery Loring, I would reverse Loring's convictions and remand for a new trial.  Therefore, I dissent.

References to African-Americans as subhuman simians plague the history of Europe and America beginning when seventeenth century Caucasian explorers encountered sub-Saharan Africa.  Going forward, at the beginning of the twentieth century, eugenics literature elaborated on comparative anatomy purporting to prove that the Negro is an ape.  Representations of the Negro depicted a gorilla dressed like a man.  In 1904, despite the ending of slavery, the St. Louis World's Fair exhibited, in a zoo cage, Oto Benga, a captured pigmy from the Congo.  Apes and monkeys appeared as stand-in actors for African-Americans in Hollywood movies.  *The Birth of a Nation* (D.W. Griffith Productions 1915), the first movie ever exhibited inside the White House, chronicled the rise of the Ku Klux Klan as the antidote to rapes of fair maidens by Black beasts.  The cultural myth of black simian nature justified Jim Crow laws and lynching.

The logic of black infrahumanity framed the guilty verdict against the Scottsboro Boys in 1931 and the accusations against the Central Park Five in 1989. In the 1992 prosecution of Rodney King's assailants, the attacking law enforcement officers painted, to their success, King as exhibiting bestial strength and, like an ape, maintaining a higher threshold of pain tolerance. At the 2021 trial of Derek Chauvin, Chauvin unsuccessfully modified this moniker when portraying George Floyd as a large, strong, aggressive man needing restraint.

The racist trope of an African-American as a simian endures today. Brent Staples, *The Racist Trope That Won't Die*, N.Y. TIMES, June 17, 2018, https://www.nytimes.com/2018/06/17/opinion/roseanne-racism-blacks-apes.html (last visited May 3, 2024). A study showed young people swayed by Black-ape associations, even when they claimed to know nothing about the historical context of racist simianization. *Discrimination against Blacks Linked to Dehumanization, Study Finds*, STANFORD NEWS SERVICE, Feb. 7, 2008, https://news.stanford.edu/pr/2008/pr-eber-021308.html (last visited May 3, 2024). A reasonable juror even this late in history would understand a "description of a gorilla pimp to be related to animal-like behavior." *State v. McKenzie*, 21 Wn. App. 2d 722, 731-32, 508 P.3d 205 (2022).

Use of the term "gorilla pimp" is more than insensitive. Forgetting about my birthday is insensitive. Uttering the term "gorilla pimp" is inflammatory and racist to its core. An African-American holds some inoculation against the N-word. Being likened unto a zoo animal scorches more.

2

Washington precedent demands reversal of a conviction when the State relies on racist tropes, particularly extreme bigoted metaphors such as "gorilla pimp." According to our state Supreme Court, a prosecutor violates a defendant's right to a fair trial when appealing to racial stereotypes. *State v. Zamora*, 199 Wn.2d 698, 709-10 (2022). Racist rhetoric risks engaging the passions and prejudice of the jurors. *State v. McKenzie*, 21 Wn. App. 2d 722, 730, 508 P.3d 205 (2022). Such language can never be condoned. *State v. McKenzie*, 21 Wn. App. 2d 722, 730 (2022). The prosecutor's remarks need not expressly reference race or ethnicity to be improper. *State v. Zamora*, 199 Wn.2d 698, 714 (2022).

When judging whether to reverse a conviction, the prosecutor's intent lacks relevance because the court does not assess the attorney's subjective intent when deciding misconduct. *State v. Zamora*, 199 Wn.2d 698, 716 (2022). Inaction by defense counsel also does not excuse a prosecutor's misconduct. *State v. Zamora*, 199 Wn.2d 698, 716-17 (2022). Regardless of whether the defendant objected at trial, when the defendant on appeal argues that prosecutorial misconduct implicated racial bias, the reviewing court asks whether the prosecutor "flagrantly or apparently intentionally" appealed to racial bias in a way that undermines the defendant's credibility or the presumption of innocence. *State v. Zamora*, 199 Wn.2d 698, 718 (2022). If so, the defendant need not establish prejudice. *State v. Zamora*, 199 Wn.2d 698, 721 (2022). Instead, the prejudice is incurable and requires reversal regardless of the evidence against the defendant. *State v. Zamora*, 199 Wn.2d 698, 721 (2022).

3

When determining whether the prosecutor's conduct "flagrantly or apparently intentionally" appealed to jurors' potential racial bias, the court asks whether an objective observer could view the prosecutor's questions and comments as an appeal to the jury panel's potential prejudice, bias, or stereotypes. *State v. Zamora*, 199 Wn.2d 698, 717-18 (2022). The objective observer is a person who is aware of the history of race and ethnic discrimination in the United States and aware of implicit, institutional, and unconscious biases, in addition to purposeful discrimination. *State v. Zamora*, 199 Wn.2d 698, 718 (2022). To aid in this analysis, the court considers the apparent purpose of the statements, whether the comments were based on the evidence or reasonable inferences in the record, and the frequency of the remarks. *State v. Zamora*, 199 Wn.2d 698, 718-19 (2022).

In *State v. Zamora*, 199 Wn.2d 698 (2022), the Washington Supreme Court reversed a conviction for assault of a law enforcement officer because of comments by the prosecuting attorney during voir dire. The high court spent little time on the underlying facts behind the intercourse between Joseph Zamora and law enforcement officers. The court did not measure the strength of the State's evidence to convict. The court instead applied "the tested and proven rule of *automatic reversal*." *State v. Zamora*, 199 Wn.2d 698, 722 (2022) (emphasis added).

The Washington Supreme Court, in *State v. Zamora*, reversed Joseph Zamora's conviction based on numerous rationales. The court applied an automatic reversal rule because racial and ethnic bias in the judicial system fundamentally undermines the

principle of equal justice and is repugnant to the concept of an impartial trial. *State v. Zamora*, 199 Wn.2d 698, 709 (2022). Theories and arguments based on racial or ethnic stereotypes are antithetical to an impartial trial. *State v. Zamora*, 199 Wn.2d 698, 709-10 (2022). The invasion of a trial by ethnic prejudice damages the fact and perception of the jury's role as a vital check against the wrongful exercise of power by the State. *State v. Zamora*, 199 Wn.2d 698, 711 (2022). The impact on human behavior of an appeal to racial bias cannot be measured. *State v. Bagby*, 200 Wn.2d 777, 802-03, 522 P.3d 982 (2023) (plurality opinion). Even the simplest racial cues can trigger implicit biases that affect decision-making more so than even explicit references to race. *State v. Bagby*, 200 Wn.2d 777, 795 (2023). Furthermore, past efforts to address prosecutorial misconduct have proved insufficient to deter such conduct. *State v. Zamora*, 199 Wn.2d 698, 722 (2022). Appeals by a prosecutor to racial or ethnic bias demand standards to deter such conduct. *State v. Zamora*, 199 Wn.2d 698, 721 (2022).

Numerous Washington decisions instruct a prosecuting attorney not to refer to the defendant with animalistic terms regardless of the racial implications. *State v. Music*, 79 Wn.2d 699, 716-17, 489 P.2d 159 (1971), *vacated in part on other grounds sub nom. Music v. Washington*, 408 U.S. 940, 92 S. Ct. 2877, 33 L. Ed. 2d 764 (1972); *State v. Embry*, 171 Wn. App. 714, 754-55, 287 P.3d 648 (2012); *State v. Barajas*, 143 Wn. App. 24, 39, 177 P.3d 106 (2007); *State v. Rivers*, 96 Wn. App. 672, 673-76, 981 P.2d 16 (1999); *State v. Wilson*, 16 Wn. App. 348, 356-57, 555 P.2d 1375 (1976). Animalization functions as a malicious and effective instrument of desocialization and dehumanization.

5

Simianization, an extreme version of this strategy, historically manifests a lethal combination of sexism and racism. RACISM ANALYSIS YEARBOOK ON SIMIANIZATION, APES, GENDER, CLASS, AND RACE (Wulf D. Hund, Charles W. Mills & Silvia Sebastiani eds., 2015).

The use of animal analogies deserves condemnation because of an implied racist code. *State v. McKenzie*, 21 Wn. App. 2d 722, 730, 508 P.3d 205 (2022). Coded language cannot be condoned. *State v. McKenzie*, 21 Wn. App. 2d 722, 730 (2022). Animal analogies hurt and silence those who readily understand the message. *State v. McKenzie*, 21 Wn. App. 2d 722, 730 (2022). The analogy can trigger implicit bias for listeners who do not immediately register the significance of what has been said. *State v. McKenzie*, 21 Wn. App. 2d 722, 730 (2022).

The State here asserts at least four arguments to skirt and minimize blame for Spokane County Sheriff Detective Richard Johnson's insertion of an incendiary racist slur in the prosecution of Avery Loring. First, the State contends it lacks responsibility because the witness, not the prosecutor, used the term. Second, the State implies that its attorney never expected the witness to utter the racist brickbat. Third, the State emphasizes that Detective Johnson designated Loring as a romance, not a gorilla, pimp. Fourth, the State downplays the reference by mentioning the two words were uttered only in passing.

The State suggests that the prosecutor did not engage in misconduct because the prosecuting attorney asked no questions about a gorilla pimp. Not true. In discovery, the

6

State disclosed that Spokane County Sheriff Deputy Richard Johnson would testify to the "vocabulary of pimping and sex trafficking." Clerk's Papers at 73. This vocabulary includes and an attorney prosecuting a suspected pimp would know it includes the unfortunate expression "gorilla pimp." Presumably, the prosecutor prepared his expert witness, who happened to be a local law enforcement officer, and the two would have discussed the categories of pimps and the expert's prospective testimony. The attorney and witness would have mentioned "gorilla pimp." The State's attorney could have, and should have, directed the witness not to use the flammable phrase. The prosecutor instead asked Deputy Johnson an open-ended question about the types of pimps. The prosecuting attorney knew his question would prompt an answer of "gorilla pimp." The attorney asked the witness to describe the types of pimps, including gorilla pimp. 1 Report of Proceedings (RP) (Apr. 14, 2022) at 284.

Even assuming the State's attorney avoids responsibility for insertion of inflammatory racist slurs, the State still holds blame. Detective Richard Johnson acted as much as an agent of the State as the prosecutor. Johnson, who the State promoted to the jury as a law enforcement officer with expertise in prostitution, uttered the incendiary phrase. The State emphasized that Detective Johnson served on a Federal Bureau of Investigation (FBI) human trafficking task force. Johnson insisted that terminology functioned as a "big thing in this particular line of work." 1 RP (Apr. 14, 2022) at 271-72.

7

To repeat, insertion of racial bigotry into Avery Loring's trial came through the remarks of the State's expert witness. The jury would be influenced as much, if not more, by this touted State's expert. Case law recognizes the danger that a jury may be overly impressed with a witness possessing the aura of an expert. *State v. Black*, 109 Wn.2d 336, 348-49, 745 P.2d 12 (1987); *City of Seattle v. Heatley*, 70 Wn. App. 573, 583, 854 P.2d 658 (1993); *Davidson v. Municipality of Metropolitan Seattle*, 43 Wn. App. 569, 571-72, 719 P.2d 569 (1986). The danger of a jury being unduly swayed increases with a police investigator's expert conclusion in a criminal case. *Stacy v. State*, 500 P.3d 1023, 1030 (Alaska Ct. App. 2021).

Detective Richard Johnson, the State's expert witness, pigeonheld pimps into two taxonomies. Nevertheless, categorizing pimps into two categories is simplistic such that even telling a jury about categories possesses questionable value. The nature of Avery Loring's pimping bore no relevance to the charge of promoting prostitution since guilt or innocence did not depend on whether Loring acted in the mold of Rudolph Valentino or King Kong.

Which leads to an important point. Detective Richard Johnson's suggestion that Avery Loring acted as a Romeo pimp, not a gorilla pimp, presented no excuse for the use of the nomenclature. Many pimps slip at a whim between humane hustler and sadistic souteneur. The State highlighted Loring's violent nature toward the victim in this case, A.V. The State emphasized A.V.'s fear of Loring because he slept with a gun next to him. A.V. testified that Loring later threatened her with the gun when robbing her of

$80. 1 RP (Apr. 13, 2022) at 78, 162-63, 167. Loring pointed the gun at her, and she screamed. 1 RP (Apr. 13, 2022) at 76. Later he shoved her from a car at gunpoint. 1 RP (Apr. 13, 2022) at 167, 169. During closing, the prosecutor underscored the injury sustained by A.V. when Loring shoved her from the car. 1 RP (Apr. 14, 2022) at 377-78.

One witness, who testified to A.V.'s fall from the car, declared that Avery Loring displayed a gun. A second witness averred that A.V. fell from the vehicle as the vehicle still moved. Thus, the State misleads when it downplays the reference to "gorilla pimp" as not pertaining to Loring. This bigoted and animalistic reference to a gorilla pimp would have played in jurors' minds when considering Loring's transformation from passionate pimp to violent attacker.

Even if categorizing pimps served a purpose in the prosecution of Loring, the State's purported expert witness could have used another term for "gorilla pimp." For example, the witness could have employed the phrase "violent pimp."

An objective view of history teaches that, even though Detective Richard Johnson did not initially categorize Loring as a "gorilla pimp," this label imprinted in many, if not most, jurors' minds an image of Loring as a brute jungle beast. The testimony of Loring's violent conduct at the end of his relationship with A.V. reinforced this picture of a black gorilla. Many, if not most, jurors, when seeing Loring seated at counsel table, would view him as subhuman.

Avery Loring's prosecutor flagrantly or apparently intentionally used the term "gorilla pimp" to appeal to the jury's potential racial bias. In viewing the factors for

9

reversal as announced by the Washington Supreme Court in *State v. Zamora*, 199 Wn.2d 698, 704, 512 P.3d 512 (2022), the State employed the term "gorilla pimp" only once, but its extreme erythrogenic nature cast a pall over the entire trial. The pejorative brand's content may be the quintessential stereotype of an African-American male. Use of the term served no purpose and held no relevance to the guilt or innocence of Avery Loring. The State could have proved its case without the racial bromide. No percipient witness used the terminology.

Although other decisions of this court do not control this panel, *State v. McKenzie*, 21 Wn. App. 2d 722, 508 P.3d 205 (2022) dominates the outcome. In *State v. McKenzie*, the State alleged Andre McKenzie, a Black man, of targeting a white girl for sexual exploitation. The State charged McKenzie with attempted second degree rape of a child and communication with a minor for immoral purposes. At trial, the State's attorney asked a detective involved in a sting operation whether he knew of the terms "gorilla pimp" and "romance pimp." After the witness confirmed his knowledge, the prosecutor asked the witness to define the terms. The prosecutor never referred to the phrase "gorilla pimp" in closing. This court reversed the conviction because of the passing use of the term "gorilla pimp."

In *State v. McKenzie*, the State argued that the mere mention of race during trial did not always rise to the level of misconduct. This court answered:

> Invoking the idea of a gorilla pimp is not the same as merely mentioning race. Gorilla pimp is an offensive term that had no place in Mr. McKenzie's trial. To the extent the prosecution believed it was necessary

10

> to discuss pimping as it related to the use of the term "Daddy" and Samantha's references to hustling, there was no need to bring up the idea of a gorilla pimp. The term "gorilla pimp" was never used during the undercover communications, nor was it volunteered by a witness during trial. Invoking the concept of a gorilla pimp at trial by the prosecutor served no purpose other than to dehumanize and demean Mr. McKenzie.

*State v. McKenzie*, 21 Wn. App. 2d 722, 732-33 (2022). This court reversed Andre McKenzie's conviction despite the brief and passing nature of the employment of "gorilla pimp." We declared that a criminal conviction cannot rest on a foundation of racism.

Unlike Andre McKenzie, Avery Loring was prosecuted, not for rape, but promoting prostitution. The charge of rape, however, rendered the bigotry more relevant.

The remedy for race discrimination during jury selection is reversal. *State v. Tesfasilasye*, 200 Wn.2d 345, 361-62, 518 P.3d 193 (2022); *State v. Lahman*, 17 Wn. App. 2d 925, 928-29, 488 P.3d 881 (2021). This remedy applies regardless of the strength of the prosecutor's case or the hardship to victims or witnesses. *State v. Lahman*, 17 Wn. App. 2d 925, 931-32 (2021).

Today this court misses another opportunity to strike a blow against not only covert and systemic, but overt, racism. Thus, I dissent.

_____
Fearing, J.

11